Argued and submitted July 29, affirmed October 12, 2005

In the Matter of the Compensation of
Patrick H. Drury, Claimant.

SAIF CORPORATION
and Elting Inc.,
*Petitioners,*

*v.*

Patrick H. DRURY,
*Respondent.*

03-05959; A125847

121 P3d 664

David L. Runner argued the cause and filed the briefs for petitioners.

James O. Marsh argued the cause for respondent. With him on the brief was Carney, Buckley, Hays & Marsh.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

EDMONDS, P. J.

### EDMONDS, P. J.

SAIF[1] seeks review of an order of the Workers' Compensation Board affirming an award of permanent partial disability for "cold intolerance" resulting from claimant's bilateral carpal tunnel syndrome. SAIF contends that claimant's impairment from intolerance to cold was not established by medical evidence supported by objective findings and that the board's finding that claimant's intolerance becomes disabling at 50 degrees Fahrenheit is not supported by substantial evidence or substantial reason. SAIF also contends that the board erred in failing to conclude that the administrative law judge (ALJ) abused her discretion by failing to appoint a medical arbiter regarding claimant's claim. We reject SAIF's contentions and affirm.

Claimant works as a heavy equipment mechanic and welder. In October 2001, he filed a workers' compensation claim for bilateral carpal tunnel syndrome. SAIF initially denied the claim. While the outcome of litigation on the claim was pending, claimant underwent surgery on both wrists. In July 2002, an ALJ found claimant's condition compensable, and SAIF accepted the condition of bilateral carpal tunnel syndrome in August 2002.

In November 2002, Dr. Layman, who performed claimant's wrist surgery, conducted a closing examination and sent a letter to SAIF regarding his evaluation. Under a section of the letter entitled "Impairment," Layman stated:

> "I find at this time that he has impairment related to decreased range of motion in the fingers of both hands and decreased sensibility in the fingers of the left hand. He also has impairment related to the inability to do rapid repetitive wrist or hand motions with either hand, and he also has cold sensitivity bilaterally at temperatures of 40° F or lower."

Subsequently, claimant was examined by Dr. Duff. In describing claimant's status at that time, Duff stated, "He

---

[1] Petitioners are SAIF and claimant's employer, Elting Inc. However, because their arguments are identical, we refer only to SAIF throughout this opinion.

has more cold sensitivity than he has had in the past while working outside."

In February 2003, SAIF issued a notice of closure awarding claimant compensation based solely on loss of sensation in his left index finger. Claimant requested reconsideration by the Department of Consumer & Business Services,[2] but did not disagree with the medical impairment findings used by SAIF to rate claimant's disability, nor did he request a medical arbiter examination. Accordingly, the department did not appoint a medical arbiter.

In March 2003, a specialist in the Appellate Review Unit of the department wrote to Layman, requesting more information about claimant's intolerance to cold. Specifically, she requested that Layman explain whether claimant's intolerance to cold was the result of vascular dysfunction or some other condition, and whether claimant's intolerance to cold resulted in a loss of use or function. She further asked Layman to "identify the loss of use or function that results and identify the body parts (whole hand or specific fingers) involved" if he believed that claimant's intolerance to cold resulted in a loss of use or function. Layman responded:

"With respect to cold intolerance, cold intolerance commonly follows a nerve injury and generally is a sympathetic mediated response due to the nerve injury which sometimes is seen after a nerve injury caused by carpal tunnel syndrome. Cold intolerance affects hand function in terms of the patient's need to warm the hand or to keep it protected when temperatures drop. Other than that I feel he could work satisfactorily with his degree of cold intolerance. He indicated that his cold sensitivity is at temperatures of 40° F or less bilaterally, and this would not restrict him from normal function in most work situations. Exposed to such temperatures, he would need to warm the whole hand with a glove."

The Specialist then sent a follow-up letter to Layman, requesting clarification as to "[w]hat specific loss of

---

[2] Throughout the opinion, we refer specifically to the Workers' Compensation Division, the Appellate Review Unit of that division, and the Appellate Review Specialist within that unit. All three are part of the Department of Consumer & Business Services (the department), and we use "the department" interchangeably with all three.

use or function with his hands does the worker experience with exposure to cold?" Layman responded, "At 40° F or lower, he needs to warm his hands!" He later sent another letter, expounding on his response:

"In answer to your letter of April 14, 2003, all I know at this point is that [claimant] has a need to warm his hands at 40° Fahrenheit or lower. I do not have more specific information as to whether this affects his finger dexterity, gripping, etc. If you have specific questions regarding that[,] that you would like to address, I would be glad to see him back in the office to clarify those issues. If you desire that, please forward a list of all questions you would have me ask him regarding how the cold specifically affects his hand function."

The Specialist did not respond to Layman. Rather, she sent the parties a notice that the reconsideration process had been stayed for the adoption of a temporary rule. The temporary rule was required, according to the Specialist, because the standards for rating impairment currently in existence compensated for cold intolerance from vascular impairment (Raynaud's phenomenon), but not for impairment caused by nerve injury. After receiving the notice of the stay, SAIF recommended that the department schedule a medical arbiter's examination. The Specialist rejected that suggestion on the grounds that "the worker did not request an arbiter examination, and we felt that there was sufficient persuasive information in the record to establish permanent disability for the worker." Meanwhile, Layman issued a medical statement indicating that claimant needs to "warm his hands at 50° Fahrenheit or lower."

On July 14, 2003, the department adopted a temporary rule to address claimant's cold intolerance:

"FAC-3333 As a result of the accepted bilateral carpal tunnel syndrome, the worker has developed cold intolerance of the right and left hands due to nerve injury. The standards do not address this disability. The Director finds this loss of function similar to the loss of function experienced with Raynaud's syndrome and assigns an impairment value of 35% of the right hand and 35% of the left

hand. *See* OAR 436-035-0110(6). These values shall be combined with any other applicable impairment values for the right and left hands, respectively. Notwithstanding OAR 436-035-0003, this rule applies only to WCD file No. FAC-3333."

Shortly thereafter, the department issued its order on reconsideration, which included a discussion of the temporary rule:

"Objective findings of impairment are established by physicians who use medical expertise, observations from clinical examinations, documented history, and the worker's description of the symptoms of cold intolerance and its consistency with the injury to form an expert medical opinion regarding any resulting impairment. The attending physician reported cold sensitivity that impairs the worker's ability to function when the temperature is 40-50 degrees F. or less. The attending physician reported the cold sensitivity was a direct result of a nerve injury due to the bilateral carpal tunnel syndrome and was not attributed to a vascular dysfunction. The worker repairs heavy construction equipment outdoors and the physician indicated the worker could no longer work at temperatures below 40-50 degrees. The Director finds this worker has impairment which is not addressed by the current Division 035 rules. Per the attending physician, cold intolerance necessitates the worker limit his outdoor work activities or periodically warm his hands when the temperature is less than 40 to 50° F. The medical evidence indicates the cold intolerance is due to a nerve injury and not a vascular phenomenon. However, the impairment as a result of the cold intolerance is similar to that of vascular dysfunction, such as Raynaud's syndrome. 40° F is equal to 4.44° C and 50° F is equal to 10° C. In the presence of Raynaud's Syndrome, cold sensitivity developing at temperatures below 10° C receives a value of 35%. * * * Therefore, the Director assigns a value for cold intolerance of 35% of the right hand and 35% of the left hand."

The order on reconsideration ultimately awarded claimant 57 percent scheduled disability for his left hand and 55 percent scheduled disability for his right hand. Those percentages each included the 35 percent impairment values for intolerance to cold discussed in the temporary rule. As a

result, SAIF was ordered to pay claimant additional compensation.[3]

SAIF requested a hearing on the order on reconsideration before the hearings division, and the matter was submitted to an ALJ on the record and with written briefs. SAIF argued, among other things, that claimant's statements to Layman about claimant's intolerance to cold were not objective findings legally sufficient to establish impairment and that the department should have appointed a medical arbiter. In December 2003, the ALJ issued an opinion and order affirming the order on reconsideration in its entirety. With respect to the issue of intolerance to cold, the ALJ found:

> "SAIF Corporation argues that claimant's statements to his doctor about cold intolerance [are] not sufficient to support objective findings of permanent impairment. However, the Supreme Court, in the context of compensability, has construed the definition of objective findings to be satisfied by indications of injury or disease that have the characteristic or capability of being verified through observation, measurement or reproduction regardless of whether the indications actually were observed, measured or reproduced by anyone other than the claimant. *SAIF v. Lewis*, 335 Or 92, [58 P3d 814] (2002)."

SAIF then appealed the ALJ's order to the Workers' Compensation Board. SAIF argued that the ALJ erred in concluding that claimant's statements to Layman were "objective findings," and that the department did not abuse its discretion in declining to appoint a medical arbiter.[4] The board adopted and affirmed the ALJ's order. This petition for judicial review followed.

---

[3] SAIF also was ordered to pay a penalty as a result of the increase in permanent disability compensation. However, because that penalty, by its express terms, was not based on impairment from cold intolerance, it is not relevant to this petition for judicial review.

[4] Before the board, and at earlier stages in the proceeding, SAIF argued that the findings of impairment were not due to the accepted condition. Because SAIF has not made that argument on judicial review, we do not discuss it further.

On review, SAIF makes three assignments of error: (1) "The board erred in concluding that permanent impairment from 'cold intolerance' was established by medical evidence supported by 'objective findings' "; (2) "The board's conclusion that claimant proved a permanent loss of use or function of claimant's hands at 50 degrees Fahrenheit or less is not supported by substantial evidence or substantial reason"; and (3) "The board erred in adopting the ALJ's conclusion that the department did not abuse its discretion in refusing to appoint a medical arbiter." We consider each of the assignments in turn.

■  ORS 656.283(7) imposes the following requirement:

"Evaluation of the worker's disability by the Administrative Law Judge shall be as of the date of issuance of the reconsideration order pursuant to ORS 656.268. *Any finding of fact regarding the worker's impairment must be established by medical evidence that is supported by objective findings.*"

(Emphasis added.) ORS 656.005(19) defines "objective findings" as follows:

" 'Objective findings' in support of medical evidence are verifiable indications of injury or disease that may include, but are not limited to, range of motion, atrophy, muscle strength and palpable muscle spasm. 'Objective findings' does not include physical findings or subjective responses to physical examinations that are not reproducible, measurable or observable."

SAIF argues in its first assignment that, in the context of permanent partial disability, "objective findings" not only must be *capable* of being reproduced, measured, or observed, but that they must actually be reproduced, measured, or observed by an attending physician at the time of closure or a medical arbiter in an examination during the reconsideration process. SAIF concludes that claimant's complaints of intolerance to cold are merely subjective statements and, in any event, are not capable of verification. Finally, SAIF argues that there are no "objective findings" that demonstrate that claimant's cold intolerance actually resulted in loss of use or function.

We begin our analysis of SAIF's first assignment of error with a discussion of the Supreme Court's decision in *SAIF v. Lewis*, 335 Or 92, 58 P3d 814 (2002), in which the court interpreted ORS 656.005(19). In *Lewis*, the claimant filed a claim for compensation based on exposure to pesticide-contaminated dust. The claimant's treating physician reported that such an exposure had occurred. His opinion was supported by claimant's self-reported symptoms, which included irritated eyes, sinus congestion, and production of bright yellow phlegm and sputum. 335 Or at 96. The issue before the board was whether those symptoms, which had not been observed by his treating physician, were "objective findings" under ORS 656.005(19) in support of medical evidence establishing an occupational disease.[5]

The court held that ORS 656.005(19) does not include an additional requirement that the indication of injury or disease be present at the time of examination. It explained:

> "The Court of Appeals' interpretation would alter the statutory definition by requiring health care professionals to rely solely on *verified*, rather than *verifiable*, indications of injury or disease, and physical findings or subjective responses to physical examinations that are *reproduced*, *measured*, or *observed*, rather than those that are *reproducible*, *measurable*, or *observable*."

*Lewis*, 335 Or at 100 (emphasis in original). The court further explained that "[a]n essential characteristic of the definition in ORS 656.005(19) is that it does not constrain the person who identifies an indication of injury or disease to rely solely on his or her own perceptions or examinations." *Id.* at 101. Thus, the court concluded that, because the symptoms reported by the claimant to his treating physician were observable *when they occurred*, they were "objective findings" within the meaning of the statute. *Id.* at 102.

According to SAIF, the Supreme Court's opinion in *Lewis* is limited to the issue of when objective findings exist

---

[5] ORS 656.802(2)(d), which formed the basis for the claimant's claim, provides that the "[e]xistence of an occupational disease or worsening of a preexisting disease *must be established by medical evidence supported by objective findings*." (Emphasis added.)

for purposes of determining compensability of a disease, and a different approach is required when the extent of permanent disability is at issue. Because a disability, to be considered a permanent disability, must, by definition, continue to exist at the time of evaluation and rating, the indications of impairment, in SAIF's view, must be actually verified in the closing examination. SAIF relies on the following language in *Lewis* in support of its argument:

> "In the present case, we apply the requirement of 'medical evidence supported by objective findings,' ORS 656.802(2)(d), in the context of a dispute over *compensability*, that is, whether the medical evidence was sufficient to support a finding that [the] claimant *had* or *has* an occupational disease. Other statutes may alter the issues to which medical evidence supported by objective findings must respond. For example, ORS 656.283(7) provides procedures for a hearing regarding a worker's disability following reconsideration under ORS 656.268. That statute states:
>
> > " 'Evaluation of the worker's disability by the Administrative Law Judge shall be as of the date of issuance of the reconsideration order pursuant to ORS 656.268. Any finding of fact regarding the worker's impairment must be established by medical evidence that is supported by objective findings.'
>
> "If a claimant contends in a hearing under ORS 656.283(7) that a temporary disability has become permanent, then the medical evidence supported by objective findings logically must be sufficient to support a finding of fact that the disability not only existed, but has become permanent."

335 Or at 98 (emphasis in original).

In our view, SAIF's argument raises an issue of legislative intent regarding ORS 656.005(19). Our review of ORS chapter 656 does not reveal any indication that the legislature intended the statutory requirement for objective findings to have a different meaning when the issue is the extent of permanent impairment rather than compensability. *See Knapp v. City of North Bend*, 304 Or 34, 41, 741 P2d 505 (1987) ("Absent any indication to the contrary, we assume that statutory terms have the same meaning throughout a statute."). The court's construction of ORS 656.005(19) in *Lewis* is predicated on the plain language of

the words in the statute, 335 Or at 97-100, and not on anything specific to the compensability context. Moreover, as we understand *Lewis*, the caveat made by the court throughout its opinion is that the factual and legal issues *to which the objective findings pertain* may change depending on the context of the dispute, but that does not mean that the requirement for objective findings also changes. *See* 335 Or at 98, 100 n 3. The court's statement in *Lewis* that "[o]ther statutes may alter the issues to which medical evidence supported by objective findings must respond" in reference to permanent disability is merely an illustration of that point and does not support SAIF's argument that claimant's symptoms due to intolerance to cold must be actually verified in the closing examination.[6]

Having determined that *Lewis* is applicable in this context, we turn to whether the record contains "objective findings" in support of the board's conclusion that claimant has suffered a permanent loss of function when the temperature is below 40 to 50 degrees Fahrenheit. According to SAIF, claimant's self-reported symptoms cannot be the basis for a finding of impairment; otherwise,

> "a claimant can simply give the doctor his or her own findings of impairment. So long as the doctor could have actually observed, measured, reproduced or otherwise empirically verified those findings, then it is unnecessary for the doctor to do so. That analysis makes no sense. It violates the cases cited earlier that hold that questions of permanent impairment must be determined by medical professionals."

To determine whether claimant's self-reported symptoms are objective findings, we return to the language of ORS 656.005(19). The statute is composed of two sentences. The first sentence defines "objective findings" as "verifiable indications of injury or disease that may include, but are not limited to, limitations of range of motion, atrophy, muscle strength and palpable muscle spasm." The second sentence of the statute, according to the *Lewis* court, operates to identify

---

[6] For example, in the context of permanent disability, objective findings of symptoms from which a claimant no longer suffers, as was the case in *Lewis*, would not be sufficient to establish impairment. However, in the compensability context, a claimant can be compensated for an occupational disease from which he or she has fully recovered.

"certain kinds of diagnostic conclusions that constitute verifiable indications of injury or disease that qualify as 'objective findings.' Such objective findings include either physical findings or subjective responses to physical examinations that are 'reproducible, measurable or observable.' " *Lewis*, 335 Or at 99. According to the *Lewis* court,

> "[a]n essential characteristic of the definition in ORS 656.005(19) is that it does not constrain the person who identifies an indication of injury or disease to rely solely on his or her own perceptions or examinations. Medical personnel act in accordance with ORS 656.005(19) by employing the range of diagnostic methods that their professions prescribe, including * * * interviewing the patient, family members, friends, coworkers, and others who might have information that pertains to an indication of injury or disease. Information gleaned from such sources may be sufficient to establish that a claimant had or has an indication of injury or disease. If so, then the board may properly characterize that indication as 'verifiable.' "

*Id.* at 101. Thus,

> "ORS 656.005(19) anticipates that the person who makes a finding in support of medical evidence of injury or disease will identify the particular indication or indications of injury or disease on which he or she relies. An indication of injury or disease must be one that permits the board to characterize it as 'verifiable,' or permits the board to characterize a physical finding or subjective response to a physical examination as 'reproducible, measurable or observable.' Whether those adjectival characterizations accurately describe a particular indication of injury or disease is a factual question for the trier of fact, subject to appellate review for support by substantial evidence."

*Id.*

In this case, Layman received information from claimant regarding his intolerance to cold temperatures, information that indicated that claimant has suffered permanent impairment as the result of his carpal tunnel disease. Layman also diagnosed claimant with a "need to warm his hands at 40 degrees Fahrenheit or lower." As we have previously held, nothing in the statutory definition of "objective findings" required Layman to perform an independent

test of claimant's intolerance before the board could properly characterize his indication of claimant's intolerance to cold as "verifiable." Thus, Layman's diagnostic conclusion regarding claimant, coupled with his knowledge that intolerance to cold "commonly follows a nerve injury and generally is a sympathetic mediated response due to the nerve injury which sometimes is seen after a nerve injury caused by carpal tunnel syndrome," permitted the board to properly characterize claimant's cold intolerance as "verifiable" under *Lewis* and ORS 656.005(19) and to find that claimant suffered from a permanent partial disability.[7]

SAIF's contention that, under this analysis, "a claimant can simply give the doctor his or her own findings of impairment," does not track the facts of this case or the nature of the board's determination. Claimant did not make his own "findings of impairment." He communicated his symptoms to his physician. His physician then determined—based on his knowledge of claimant's medical history, the symptoms reported by claimant, and his understanding that such symptoms commonly follow nerve damage of the type claimant suffered—that claimant was impaired at temperatures below 40 to 50 degrees Fahrenheit. Claimant's *physician*, not claimant, made the impairment findings upon which the board relied. Claimant simply reported his symptoms. Thus, for all of the reasons stated above, we reject SAIF's first assignment of error.

■ In its second assignment of error, SAIF argues that the board's conclusion that claimant proved a permanent loss of use or function of claimant's hands at 50 degrees Fahrenheit or less is not supported by substantial evidence or substantial reason. The impetus of SAIF's challenge is Layman's statement that claimant needs to "warm his hands

---

[7] In its reply brief, SAIF argues that the method for making findings of impairment for purposes of a nerve injury of this type is set forth at page 41, paragraph 4 of the AMA Guides to the Evaluation of Permanent Impairment (3rd ed, rev 1990), and that, in the absence of findings by Layman that identify a loss of use or function using those methods, the board erred in concluding that medical evidence established permanent impairment by "objective findings." The applicability of that portion of the AMA Guides in determining impairment for claimant's injury was not raised before the ALJ or the board, nor was it argued in petitioner's opening brief. Accordingly, we decline to address that argument. ORAP 5.45(1); *Clinical Research Institute v. Kemper Ins. Co.*, 191 Or App 595, 608-09, 84 P3d 147 (2004).

at 50° Fahrenheit or lower." Layman did not explain the discrepancy between that statement and his previous findings that claimant needed to warm his hands at 40 degrees Fahrenheit or lower. Subsequently, the ALJ and board appear to have merged Layman's findings and concluded that claimant has a need to warm his hands when the temperature is between 40 to 50 degrees Fahrenheit. But, according to SAIF, the use of the 50-degree figure is significant because,

> "A triggering temperature of 40 degrees Fahrenheit converts to 4 degrees Celsius or Centigrade. Under the rule used by the department for rating claimant's disability, a triggering temperature of 4 degrees Celsius puts claimant's impairment in Class 2, with a significantly lower award."

SAIF's argument mischaracterizes both the temperature conversion and the applicable administrative rule. First, as the department pointed out in its discussion of the temporary rule, 40 degrees Fahrenheit converts to 4.44 degrees Centigrade, not 4 degrees, as SAIF asserts. Class 2 of the rule adopted by the department (concerning Raynaud's phenomenon) applies to intolerance to cold "which results in a loss of use or function that occurs on exposure to temperatures *below* 4° Centigrade." OAR 436-035-0110(7). (Emphasis added.) Thus, regardless of whether claimant's intolerance to cold begins at 40 degrees or 50 degrees Fahrenheit, the resulting loss of use or function falls within Class 3 of OAR 436-035-0110(7) and the temporary rule, rather than Class 2. We conclude therefore that the board's opinion is supported by both substantial evidence and substantial reason.

■    In its final assignment of error, SAIF contends that the board should have determined that the department abused its discretion in failing to appoint a medical arbiter. SAIF relies on ORS 656.268(7)(b), which provides, "If neither party requests a medical arbiter and the director [of the department] determines that insufficient medical information is available to determine disability, the director may refer the claim to a medical arbiter appointed by the director." Assuming that the department's discretionary act under ORS 656.268(7)(b) could be overturned by the board, we have

already determined that Layman's medical opinion constituted a sufficient basis for a finding of impairment. Thus, the department had sufficient medical information available to determine impairment, and it was not required to exercise its discretion under the rule.

Affirmed.